**Debra WALKER, et al., Plaintiffs,**

v.

**UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, et al., Defendants.**

**No. CA 3–85–1210–R.**

United States District Court, N.D. Texas, Dallas Division.

Aug. 4, 1989.

Revised Sept. 22, 1989.

Michael M. Daniel, Elizabeth K. Julian and Kenneth L. Schorr, North Central Texas Legal Services, Inc., Dallas, Tex., for plaintiffs.

Arthur Goldberg, Leslie K. Shedlin, Thomas H. Peebles and Jonathan Strong, Dept. of Justice, Civil Div., Washington, D.C., Joseph G. Werner, Haynes & Boone, Marvin Collins, U.S. Atty., and Donald W. Hicks, Hill, Hicks & Collins, Dallas, Tex., for defendants.

### MEMORANDUM OPINION—WALKER III: JOINDER OF THE CITY OF DALLAS AS A DEFENDANT SUBJECT TO THE CONSENT DECREE

BUCHMEYER, District Judge.

This is a class action that involves racial discrimination in low-income public housing in the City of Dallas and its suburbs. The original parties were the plaintiff class ("plaintiffs"), the Dallas Housing Authority ("DHA"), and the United States Department of Housing and Urban Development ("HUD").

This opinion,[1] however, concerns the City of Dallas.[2]  And, it holds:

(i) that the City of Dallas will be joined as a party defendant in this case;

(ii) that the Consent Decree approved on Jan. 20, 1987 will be modified so that it is binding on the City of Dallas;

(iii) that the plaintiffs are entitled to summary judgment as to liability against the City of Dallas because the undisputed facts establish that the City was a substantial cause of DHA's deliberate racial segregation and discrimination in its public housing programs in Dallas; and

(iv) the scope of the injunction to be entered against the City of Dallas and the specific modifications that will be made to the Consent Decree—*as well as the financial obligations to be imposed upon the City as a result of this opinion*—will be determined after a hearing and the presentation of evidence by all parties.

These rulings should come as no surprise.  In April of 1988, the "Housing Mediation Team" appointed by the Mayor recommended that "the City of Dallas should voluntarily agree to enter into the *Walker v. HUD* Consent Decree," stating:

"... We believe that there is strong sentiment by all parties with whom we have talked that the City has had an active, historical involvement in the DHA's operations and, therefore, bears some responsibility for the condition of public housing in Dallas.  As a result, we have concluded that the City will be brought into the lawsuit involuntarily and will likely face enormous legal expenses in its defense.  If the City is found liable, it then faces the likelihood of considerable financial outlays.  It is for these reasons that we believe the City should enter the Consent Decree voluntarily."

To show why the City of Dallas should be joined as a defendant in this case subject to the Consent Decree—and why summary judgment as to liability should be entered against the City—this opinion will discuss (i) the procedural history, (ii) the relationship between DHA and the City, (iii) the long, unbroken history of deliberate segregation and discrimination in public housing by DHA *and* by the City of Dallas (iv) the conduct of the City and its officials concerning the Consent Decree, and (v) the applicable law.

## I.  *The Procedural History*

The complete procedural history of this action—both before and after the original parties settled the case with a Consent Decree approved by the Court on Jan. 20, 1987—is detailed in the *Walker I* companion opinion.  However, these additional facts are necessary to show the procedural setting for this opinion.

On Sept. 8, 1988, the plaintiffs filed a Motion to Modify the Consent Decree and to Enjoin the City of Dallas.[3]  Then, on Dec. 21, 1988, the plaintiffs filed an "alternative" Motion to Add the City of Dallas as a Party Defendant (and to file a Supplemental Complaint against the City).  Both motions sought injunctive relief against the City of Dallas for the following reasons:

"1) There is a need for additional resources to accomplish the purposes and programs of the Consent Decree,

"2) The City of Dallas has a legal obligation to assist in the disestablishment of the racial segregation in DHA's programs and the housing patterns of the City of Dallas,

---

**1.**  Two companion opinions are being released at the same time.  They are "*Walker I:* DHA Violations of the Consent Decree and Appointment of a Special Master," 734 F.Supp. 1231, and "*Walker II:* The Frost Amendment and the Anti–Demolition Statute," 734 F.Supp. 1272, and they will be cited in this opinion as "*Walker I*" and "*Walker II*."

**2.**  This opinion (originally filed Aug. 4, 1989) has been revised for publication, primarily by the deletion of some 59 footnotes (which only contained references to exhibits and testimony in support of the undisputed facts stated in this opinion).

**3.**  The plaintiffs threatened to do this in early 1988, and that resulted in the Mayor's appointment of the Housing Mediation Team in February of 1988.

"3) The City of Dallas has opposed and attempted to obstruct the operation of the Consent Decree,

"4) The City of Dallas was a substantial cause of the creation and maintenance of racial segregation and discrimination in the housing assistance programs administered by the Housing Authority of the City of Dallas [DHA]."

The City of Dallas filed its reply to the plaintiffs' first motion (the motion to modify the Consent Decree) on Oct. 7, 1988. However, the City did not respond to the second motion (the motion to add the City as a party defendant); instead, it simply filed an answer to the plaintiffs' Supplemental Complaint on Jan. 11, 1989.[4]

On Dec. 12 and 14, 1988, a hearing was held on the plaintiffs' Motion to Modify the Decree and to Enjoin the City of Dallas.[5] The evidence presented at that time primarily concerned the plaintiffs's liability claims against the City, and it did not focus on what specific relief should be granted. However, the plaintiffs sought a broad injunction which would:

(i) prohibit the City of Dallas from racial discrimination in "housing-related actions" and from obstructing the operation of the Consent Decree;

(ii) require the City to provide a "local program of housing assistance that meets the replacement housing requirements of 42 U.S.C. § 1437p" for the units to be demolished at the West Dallas Project;[6]

(iii) require the City to provide "the counseling and transportation services" necessary to help black families move to non-minority areas in Dallas and its suburbs under DHA's § 8 assistance program;[7]

(iv) require the City to improve the "facilities and neighborhoods of DHA's family housing projects" so they are equal to the facilities and neighborhoods of the "predominately white-occupied HUD assisted projects"; and

(v) require the City to implement an effective code enforcement program "to eliminate substandard conditions" at DHA's public housing projects and § 8 assisted units.

The plaintiff's Dec. 21, 1988 motion (to add the City as a party defendant) was expressly based upon the testimony and exhibits presented at the Dec. 12, 1988 hearing. This was also true of the plaintiffs' motion for summary judgment (also filed Dec. 21, 1988). And, the response by the City of Dallas to this summary judgment motion was based upon "the exhibits and testimony admitted into evidence at the Dec. 12, 1988 hearing."[8]

## II. *Relationship Between DHA And The City of Dallas*

### 1. *The City's Control of DHA In General*

In 1938, DHA was created by the City of Dallas under Texas law. The five-member Board of Commissioners, which has responsibility for the operation of DHA, is appointed by the Mayor of Dallas.[9] The rela-

---

4. The order permitting the plaintiffs to file their Supplemental Complaint against the City of Dallas is being entered on the same day as this opinion.

5. Originally, in its Oct. 7, 1988 response to this motion, the City of Dallas objected on the grounds that it had not been given an opportunity to contest the evidence introduced at prior hearings or to cross-examine any witness. At the Dec. 21, 1988 Hearing, the City was given the full right to do this, as well as to introduce its own evidence and to challenge the testimony and exhibits offered by the plaintiffs, DHA and HUD at the Dec. 12, 1988 Hearing.

6. The significance and magnitude of this requirement is discussed in *Walker II.*

7. The significance and magnitude of this requirement is discussed in *Walker I.*

8. Although none of the *material* facts shown by the exhibits and testimony at the Dec. 12, 1988 Hearing were disputed, see the opinion in *Walker I,* at fn. 16, for this Court's credibility determinations regarding the witnesses who testified at each hearing in this case. *Nor is this opinion intended to reflect in any way upon the performance of Mr. Alphonso Jackson, who became Executive Director of DHA after the Dec. 12, 1988 Hearing in this case.* See *Walker I,* at fn. 4. Finally, as in *Walker I,* this opinion constitutes the Court's findings of fact and conclusions of law required by Rule 52, Fed.R.Civ.P.

9. State law authorizes the creation of public housing authorities, but provides that only the city council may activate such an authority. Tex.Local Gov.Code §§ 392.011(a), 392.031, 392.034.

tionship between the City and DHA was correctly described by City Council Member Lori Palmer:

"So while it is true that there are times when public officials in the City Council claim we have no direct responsibility or authority over that (DHA) board, that is not true. As a matter of fact, we make those appointments. And I have no doubt whatsoever that the policies and traditions which have been developed by the Dallas Housing Authority are a direct reflection of what has been the spoken or unspoken political climate in the city. I do not think that the DHA has been out on a limb in the development of those policies over many years."

Similarly, DHA Executive Director Jack Herrington testified that, in his experience, "members of the [DHA] Board have been responsive to the Mayor who appoints them."

In addition, under the "Cooperation Agreement" between the City of Dallas and DHA,[10] the City agrees to "cooperate with [DHA] by such action as the City and [DHA] may find necessary in connection with the development and administration of the public housing" in Dallas. Accordingly, the City has described its relationship with DHA in this manner:

"The Housing Authority of the City of Dallas was created by City Council resolution. It provides a specific public service in response to a need found by the Dallas City Council. State law recognizes this relationship as different from relationships the City has with other legal entities or governments.... The *Authority is, in effect, an 'arm of convenience' of the city government.*"[11]

Recognizing that *DHA has no power to levy taxes*, the City of Dallas has provided assistance to DHA in numerous ways, including: performing many of the Housing Quality Standard inspections for DHA's § 8 program; acting as a co-administrator of DHA's § 8 Moderate Rehabilitation Program; and providing relocation services for residents displaced by DHA's acquisition of land for its projects.

*More significantly, the City of Dallas—*through its employees, as well as the Mayor and members of the City Council—*has directly intervened in the operations of DHA and has, on numerous occasions directed DHA to take certain actions.*[12] Examples of this control which the City of Dallas has historically exercised over DHA include:

... the City's selection of sites for DHA's public housing;

... its direction that DHA construct the 3500–unit West Dallas Housing Project; and

... the City's placement of one of its own employees into the position of Executive Director of the DHA.

These and *many other* situations in which the City exercised control over DHA are discussed in part III (*"Deliberate Segregation in Public Housing by DHA and by the City of Dallas"*).

2. *The City's Responsibility Under the CDBG Program to Prevent Discrimination by DHA*

Since August of 1974, the City of Dallas has participated in the federal Community Development Block Grant ("CDBG") program, which is administered by HUD. By 1988, the City had received $195 million in CDBG funds, an average of $15 million per year over the past 15 years.

Because of its receipt of these CDBG funds, the City had these obligations: to refrain from racial discrimination in its housing-related activities; to eliminate the effects of any past housing-related discrimination; and to administer all programs and activities related to housing and community development in a manner to affirmatively

**10.** This cooperation agreement is required by 42 U.S.C. §§ 1437(c)(e)(2) as a condition to the receipt of federal assistance for public housing programs.

**11.** Dec. 12, 1988 Hearing: Pls. Exh. 2, pp. 7–9 (Dallas Department of Housing & Neighbor-

hood Services, Report of the Task Force on Public Housing—Jan. 1983).

**12.** Since 1974, under federal law the City has the specific authority to determine the location of any new public housing in Dallas. 42 U.S.C. § 5304(c)(1)(C).

further fair housing. 42 U.S.C. § 5304(b)(2); 24 CFR § 570.601.

*Under these CDBG requirements, it is clear that the City of Dallas also had an obligation to prevent DHA from engaging in racial discrimination and segregation in its public housing programs*—and to further the goal of "fair housing" by requiring DHA to eliminate the effects of its past discrimination in public housing. This is particularly true since the City used DHA as a substantial source of the "housing assistance" which the City had to show to HUD in order to qualify for the $195 million in CDBG funds.[13] Cf. *NAACP v. Secretary of HUD*, 817 F.2d 149, 154–157, 160–161 (1st Cir.1987).

### 3. *But The Tragic Facts*

The City of Dallas can, without question, control the activities of DHA. It has actually done so since 1938 under its general relationship with DHA. And, after August of 1974, it had the responsibility to do so under the CDBG program.

At any time—*yes, at any time*—the City of Dallas could have forced DHA to stop its deliberate policy of strict racial segregation in low-income public housing in Dallas. But instead, the tragic facts are these: *Throughout the history of DHA, the City has known of DHA's blatant policies and practices of racial segregation and discrimination*—but, as detailed in the next section of this opinion, *not only did the City refuse to intervene to stop these illegal practices, it actually participated in this conscious discrimination against minorities in public housing in Dallas.*

### III. *Deliberate Segregation in Public Housing by DHA and by the City of Dallas*

From its beginning, the primary purpose of DHA's public housing program was to prevent blacks from moving into white areas of this city. The City of Dallas knew of this intentional segregation; and, it repeatedly took actions either to cause this racial discrimination and segregation, or to help DHA maintain it.

### 1. *The Beginning (1938)*

After DHA was created in 1938 by resolution of the Dallas City Council, the very first site for DHA public housing was selected by the City of Dallas. Specifically, a 1938 survey by the City Manager recommended "one of the Negro slum areas" for the first low-income public housing project in Dallas:

"These areas [for the Roseland Homes project] are close in, located in the center of a well established Negro district and *ideally suited as a possible location for a Negro housing project....*" [14]

In the same survey, the Dallas City Manager recommended the location of a "Mexican project" as close as possible to "the Mexican area." [15] There was, however, no recommendation for a "white project" site.[16]

---

**13.** In order to receive CDBG funds, the City's Housing Assistance Plan filed with HUD must meet certain criteria—including the promotion of a greater choice of housing opportunities and the avoidance of undue concentrations of assisted persons in areas which contain a high proportion of low and moderate income persons. The Plan must also specify a realistic goal of the number of housing units that will assist low-income persons. 42 U.S.C. § 5304(c)(1)(B) and (C). The City has repeatedly included the DHA public housing programs as part of the means by which the City's "realistic goals" for the use of CBDG funds will be met.

**14.** This survey specified the specific areas of the City tjat were designated for whites, for "Negros," and for "Mexicans." Dec. 12, 1988 Hearing: Pls. Exh. 1 (General Survey of Housing Conditions, pp. 10–13).

**15.** In a chilling forecast of the eventual demise of the historic *"Little Mexico"* area of Dallas, this same 1938 survey states:

"Due to the zoning classification, the high value placed on the property and its future use as industrial property, this *[the Mexican Area] is not a desirable location to house the Mexican slum dwellers.* The Mexican project should be removed from this immediate area but should be located as near as possible to the district in which they now reside."

**16.** Most low-income white families in Dallas have always been able to receive federal housing assistance without the use of DHA programs by living in projects which receive subsidies directly from HUD. Dec. 12, 1988 Hearing: Pls. Exh. 89 (summary of location and occupancy characteristics of HUD–assisted projects in Dallas County).

## 2. Public Housing in Dallas: 1942–1953

Not surprisingly, DHA located the "Negro housing project" (Roseland Homes) and the "Mexican project" ("Little Mexico") exactly where the Dallas City Manager had "recommended." When they opened in 1942, Roseland Homes (611 units) was 100% black and Little Mexico (102 units) was 100% Hispanic. In October of 1988—some 21 months after the Consent Decree was approved (Jan. 20, 1987)—Roseland Homes was still 94.45% black.[17]

In 1937, DHA opened its first white project, Cedar Springs Place. When this suit was filed in 1985, Cedar Springs (385 units) was 37% black, and in October 1988 it was 41.42% black. (White occupancy at Cedar Springs was less than 18% in 1985, dropped to 13% by Jan. 20, 1987.)

In 1943, DHA opened a second all-white project: Washington Place. However, by 1974, Washington Place (347 units) was 54% black, and it ranged from 76%–81% black from 1977–1984. In 1985, when this suit was filed, Washington Place was gone, having been demolished after its controversial sale to Baylor University Medical Center.

The next four projects opened by DHA were, of course, 100% black: Frazier Courts (550 units) in 1943; Brackins Village (102 units) in 1952; and Turner Courts (294 units) and Rhodes Terrace (426 units) in 1953. In October of 1988, these four projects are still from 96–98% black.

## 3. Not In My Neighborhood: Chapter One (1950)

The first recorded instance of DHA yielding to political pressure and neighborhood opposition in selecting sites for public housing took place in 1950. Then, DHA was considering property at Haskell and Dolphin for "a Negro project." However, whites who owned land across the street objected; the DHA Board minutes for October 30, 1950 describe the meeting of DHA's Executive Director with a committee representing the opposition to this "Negro project":

"This committee was representing a group of approximately 100 property owners who opposed the location of Project TEX-9-9 on the northwest corner of Dolphin and Haskell Avenues. He reported that they insisted that the line of demarkation between colored residents and white residents in that area was Haskell Avenue. He reported that he had explained to these people the plan of the Housing Authority to erect a very tall fence and to put shrubs, effectively separating the housing project which may be occupied by Negroes and the property now occupied by these people but he had had little success in securing cooperation from them. He reported that the committee was aroused emotionally over the situation, and the people they represented were so aroused there is a possibility that racial difficulties which have existed in the past in South Dallas may become serious if the Authority continues its plan to erect a public housing project in this particular spot...."

As a result, DHA abandoned its consideration of this site—and continued to honor the racial "areas of the City" outlined by the Dallas City Manager in his 1938 survey.[18]

---

**17.** The statistics throughout part III of this opinion are taken from Dec. 12, 1988 Hearing: Pls. Exh. 31 and Dec. 12, 1986 Hearing: Pls. Exh. 1.

**18.** At this time (1950), state law gave Texas cities the power to enact ordinances under which there was residential segregation by race. Tex.Rev.Civ.Stat.Ann. art. 1015b (repealed 1969). Section 321 of the 1907 Dallas City Charter expressly provided for the City's power to "provide for the use of separate blocks for residences, places of abode, places of public amusement, churches, schools and places of assembly by members of white and colored races." The United States Supreme Court declared such ordinances unconstitutional in 1917, Buchanan v. Warley, 245 U.S. 60, 38 S.Ct. 16, 62 L.Ed. 149 (1917), but the City of Dallas continued to enforce its racially restrictive ordinances. See City of Dallas v. Liberty Annex Corp., 19 S.W.2d 845 (Tex.Civ.App.—Dallas 1929); Housing Authority of the City of Dallas v. Higginbotham, 143 S.W.2d 95 (Tex.Civ.App.—Dallas 1943). This ordinance—which provided separate areas of residence for whites and minorities—was finally repealed by City Charter amendment in 1968.

4. *The West Dallas Project (1950–55): A Solution to the "Negro Housing Problem"*

In 1950, the City of Dallas and DHA faced a severe test: the need for additional low-income housing to keep blacks from moving into white areas. This became known as the "Negro Housing Problem."

Whites in South Dallas were demanding that the City of Dallas take action to prevent black families from buying homes in white districts. Several bombings of homes bought or built by blacks in white areas were reported. A Feb. 26, 1950 Dallas Morning News article depicted the "Negro Housing Problem" with a map:

"This map shows the Negroes' housing plight in Dallas. In the shaded areas, most of the city's 75,000 negroes live, spotted in between white neighborhoods. They cannot expand without spilling over into white sections."

The same article summarizes the plan of a Dallas City Council member (Roland Pelt) for "an entire Negro city" to be built next to the Trinity River.[19]

The 1950 Joint Report on Negro Housing found that "the shortage of housing for Negroes in Dallas is acute and critical"; that a "serious tension has resulted, not only among the colored people, but also among a considerable portion of our white population"; that some of the "present Negro residential districts are 'hemmed in' and cannot possibly be expanded" without the consequent "displacement of white residents"; that this "makes for forced sales and losses, disturbed and distressed communities, unrest, tension and trouble"; and that "portions of South Dallas particularly

have been subjected to this kind of disturbance."

Accordingly, the 1950 Joint Report on Negro Housing expressed "sincere approval" of the recently announced plans for the West Dallas project. This Report also stated:

"(a) The Negro housing sections, if carefully zoned and properly restricted by the City or county, will attract Negro families of good character, people who, under proper environment, will make citizens of whom our community can be proud.

"(b) We remind the people of Dallas that if we do not provide home sites for Negroes who want to, and can afford to, buy or rent suitable and decent homes, the alternative is terrible overcrowding, dissatisfaction, disease, tension resulting from Negroes buying into white neighborhoods, and many other serious consequences....

"...

"*The Committees feel that the only satisfactory and permanent solution to this problem can be realized where there is racial segregation.* It is the opinion of the Committees that this basic factor is recognized by the Negro leadership of our community, *so long as segregation in the sense that it is applied here does not mean discrimination.*"

The 1950 Joint Report also said "that Dallas is fortunate in having a very high type of Negro leadership, the leaders being men of intelligence, vision, and a fine sense of civic responsibility."[20]

It was with this climate that the City of Dallas requested DHA to build the largest low-rise public housing project in the na-

Dec. 12, 1988 Hearing: Pls. Exh. 7 (Dallas City Charter—1952). *The City of Dallas admits that these laws established "racially segregated housing patterns [that] have not yet fully been eradicated"*—but it denies that there is "any current policy within the City of Dallas to provide housing on a racially discriminatory basis."

19. Dec. 12, 1988 Hearing: Pls. Exh. 8 (1950–51 newspaper articles); Pls. Exh. 9 ("*Report of Joint Committee on Negro Housing*" of the Dallas Chamber of Commerce, the Dallas Citizens

Council, and the Dallas Inter–Racial Committee, dated May 24, 1950 and January 24, 1951) ("*the Joint Report on Negro Housing*"); Pls. Exh. 10 (1962–66 documents, p. 1).

20. The 1950 Joint Report on Negro Housing, p. 20, also noted that "Negro School students" could "by special arrangements" use the Dallas Public Library—and it recommended that "*a study be made relative to adult negroes being given access to the Dallas Public Library for the securing of books they desire.*"

tion: *the 3500 unit West Dallas project.*[21] Specifically, in a letter dated Sept. 25, 1950, Dallas Mayor Wallace H. Savage requested:

(i) DHA to select West Dallas for "the location of approximately 3500 low-rent housing units for Negroes, Latin Americans, and Whites";

(ii) DHA to apply for 1700 new construction public housing units, and combine these with the 1800 that DHA already had, for the West Dallas project.[22]

The City Council authorized the Mayor to send this request to DHA; indeed, City Attorney Henry Kucera is described in contemporaneous DHA documents as the "chief architect" of the West Dallas plan.

Of course, DHA acceded to the City's request to solve the "Negro Housing Problem." And, it planned and developed the West Dallas project under an overt policy of racial discrimination. So, when West Dallas was opened in 1955:

(i) *Edgar Ward Place* (1500 units) was 100% black;

(ii) *Elmer Scott Place* (500 units) was 100% Hispanic; and

(iii) *George Loving Place* (1500 units) was 100% white.

The segregation at West Dallas was so complete that separate parks and commercial areas were set aside for the separate races.

However, within two years after the West Dallas project was opened, *DHA was having substantial vacancy rates for the white and the Hispanic units.* DHA attributed this to the "stigma attached to the area known as West Dallas"; to the "lack of adequate shopping facilities, churches and cultural facilities"; to significant "environmental disadvantages, such as odors, smoke and dust from neighboring industri-

al plants"; and to the need for additional security.[23] However, in this same document, DHA noted:

"It should be pointed out that no occupancy problem has been encountered in connection with [*Edgar Ward Place*], *1500 units for Negro occupancy.* Although the latter project is also located in West Dallas and is subjected to the same adverse factors influencing [*George Loving*] and [*Elmer Scott*], it is apparent that the heavy and constantly increasing demand for low-rent public housing for Negroes *and the lack of other adequate housing for Negroes in this community* have combined to overcome all adverse factors and this has resulted in a stabilized occupancy with a long waiting list of Negro applicants."

This report was the first indication that the "white" *George Loving Place* and the "Hispanic" *Edgar Ward Place* might also become part of the "solution" to the "Negro Housing Problem."

5. *Not In My Neighborhood—Chapter Two (1962)*

In 1962, DHA proposed the construction of an additional 3,000 units of low-rent public housing in Dallas. A referendum was called in opposition to the expansion of public housing. The City Council endorsed this referendum—opposing new public housing for Dallas—despite the fact that it was needed for the poor in Dallas.

In the resulting campaign, there was opposition to the 3,000 units because they *were not* going to be placed in West Dallas. There were also numerous ads which raised the specter that the housing would be integrated and would be placed in white neighborhoods. The anti-public housing refer-

---

**21.** Dec. 12, 1988 Hearing: Pls. Exh. 44. The West Dallas project is the second largest public housing project *of any type* in the United States.

**22.** At this time, West Dallas was not even in the Dallas city limits. DHA's application for the West Dallas project gave this description:

"The area selected is in what is known as 'West Dallas,' a sprawling slum community of approximately five square miles ... West Dallas is the largest concentration of substandard

dwellings and slum conditions in and around Dallas ..."

**23.** Dec. 12, 1988 Hearing: Pls. Exh. 5 (1950's documents, Oct. 1955 Application, pp. 17, 22) (also noting "the general restlessness, mobility and instability of many of the white and latin-American families comprising the segment of the low-rent market who have been willing to move to 'West Dallas'").

endum passed, and *no new low-rent public housing* [24] *would be built in Dallas from 1955 (when West Dallas was opened) to August of 1989.* [25]

### 6. Assignment of Tenants By Race (1965–70): The Loss By DHA of Over $31 Million

DHA maintained the segregated nature of its public housing by its tenant assignment and selection practices—under which whites were assigned to all-white projects and blacks were assigned to all-black projects. Accordingly, in 1965, [26] DHA had two all-white units (*George Loving, Cedar Springs*), two all-Hispanic units (*Elmer Scott, Little Mexico*), and six projects that were 100% black. However, in 1965, HUD—acting under the provisions of Title VI of the 1964 Civil Rights Act, 42 U.S.C. § 2000d—insisted that DHA cease its assignment of tenants by race. [27]

#### ... freedom of choice?

After some delay and resistance, aided by City Attorney Alex Bickley, DHA finally adopted a "Freedom of Choice" desegregation plan—which it claimed had been approved by the Dallas Mayor and other local officials. [28]

Incredibly, under this "Freedom of Choice" plan, no notice was to be given to applicants that they could apply to the project of "their choice." In addition, the plan required DHA Board approval if an applicant for a particular project was not of the predominate race at that project. Not surprisingly, under this "Freedom of Choice" plan—*with the exception of West Dallas*—there was no change in the racial composition of DHA's public housing; the white units remained 100% white and the minority units remained 100% minority.

With respect to West Dallas, the 1965 "Freedom of Choice" plan called for the "careful selection" of four black families to move, without publicity, into *George Loving Place* (which had numerous vacancies in 1965). By 1967, *George Loving* had become 35% black; and it was 72% black by 1969, over 90% black by 1971, and 95% black by 1974. [29]

#### ... first-come, first-served?

In 1967, HUD rejected the use of "Freedom of Choice" plans by DHA and other public housing authorities—because such plans were perpetuating racial segregation in low-income housing. And, HUD required all public housing authorities to adopt a "first-come, first-served" tenant selection policy and to use a community-wide waiting list for all projects administered by the authority. [30]

In response, DHA's Board simply rejected HUD's Title VI mandate to stop the use of the "Freedom of Choice" plan. HUD responded by threatening to sue DHA to withhold federal funds from both DHA and the City of Dallas. *The City then advised DHA to terminate the "Freedom of Choice" plan,* and DHA reluctantly agreed

---

24. Except for projects for the elderly. Dec. 12, 1986 Hearing: Pls. Exh. 1.

25. The anticipated completion date for the 100 units of new public housing being constructed at *Country Creek* under the Consent Decree. See this Court's opinion in *Walker I.*

26. Despite the fact that *de jure* racial segregation in public housing was declared unconstitutional in 1955. *Detroit Housing Commissioners v. Lewis,* 226 F.2d 180, 183–184 (6th Cir.1955).

27. Before this, HUD had accepted segregated public housing under a "separate but equal policy." Dec. 12, 1988 Hearing: Pls. Exh. 25 (Hearing Before The U.S. Commission on Civil Rights, June 1959). *Heyward v. PHA,* 238 F.2d 689, 697 (5th Cir.1956); *Cohen v. PHA,* 257 F.2d 73, 74 at fn. 5 (5th Cir.1958).

28. This 1956 plan was prepared in consultation with the Dallas Citizens Council, a civic organization that had supported racial segregation in public housing. Dec. 12, 1988 Hearing: Pls. Exh. 10 (1962–1966 documents); Pls. Exh. 9 (1950 Joint Report on Negro Housing).

29. The all-Hispanic *Elmer Scott Place* had a similar transition; it had become 21% black by 1968, 57% black by 1970, and 85% black by 1975.

30. Under these HUD requirements, offers were to "be made first in [projects] having the most vacancies"—and, after an applicant had rejected three offers of vacancies, "he is subject to being dropped to the bottom of the [waiting] list."

to do so and to adopt a "first-come, first-served" plan.

Dallas City Attorney Alex Bickley participated with DHA in the negotiations with the U.S. Department of Justice concerning the specifics of the plan to be adopted. However, the final plan which Mr. Bickley and DHA negotiated, was one which, in the opinion of the Justice Department, was:

> "... likely to result in little or no change in the racial composition of any of your other locations, all of which are presently segregated."[31]

### ... back to "freedom of choice"?

Even this did not satisfy DHA—which simply continued to operate under its "Freedom of Choice" plan. HUD found this out in 1969, and instructed DHA to comply with Title VI by implementing the "first-come, first-served" plan. The DHA Board responded with a resolution instructing the staff (i) to ask HUD for a waiver of the "first-come, first-served" requirement, and (ii) if this waiver was not given "immediately," then to "return" to the "freedom of choice" plan. HUD received this request for a waiver, but took no action on it. Accordingly, the DHA Board formally rescinded its "first-come, first served" plan—which had never really been put into effect—and "returned" to its "Freedom of Choice" plan.

### ... over $31 million: the price of "freedom of choice"

In February 1970, the federal government notified DHA that its blatant refusal to change the tenant assignment plans was in violation of Title VI. HUD then deferred funding for all DHA projects which had not been approved. And, *from 1969 through 1974, DHA forfeited in excess of $31 million because the DHA Board refused to try to end racial segregation in public housing in Dallas.* This loss included:

(i) the allocation for several hundred units of new public housing for Dallas;

(ii) the cancellation of HUD's approval for the funding of *Cliff Manor,* a low-income project for the elderly;

(iii) the loss of all modernization funds for over four years, *and the deferral of any modernization funds for West Dallas for almost a decade.*

HUD specifically asked the City of Dallas for its assistance in getting DHA to stop its blatant violation of Title VI—and in requiring DHA to adopt tenant assignment policies that would help desegregate public housing in Dallas. However, this time—unlike 1967—the City was not threatened with any loss of federal funds. *So the City of Dallas did nothing.*

This conduct by the City of Dallas and by HUD in the period from 1969 through 1974 was inexcusable. And, as the City recognized years later, this now-meaningless battle by DHA (aided by the City)—to maintain an illegal tenant assignment plan—had a devastating effect upon the condition of low-income public housing in the City of Dallas:

> "Until 1969 the Dallas Housing Authority maintained its properties in a reasonable manner and kept its financial reserves high. During this period DHA accepted no federal money for modernization and much equipment and structural components (roofs, doors, windows, etc.) were near the end of their economic life and would soon need replacement. From 1969 to 1974, DHA did not participate in federal modernization programs. Faced with declining real income, *DHA management attempted to preserve financial soundness at the expense of physical maintenance. The physical condition of DHA properties deteriorated rapidly* and most projects have never been returned to the condition they were in before ..."[32]

### 7. Public Housing In Dallas: 1971–74

In 1971, DHA opened two projects for the elderly: *Brook Manor* (233 units) and

---

**31.** Dec. 12, 1988 Hearing: Pls. Exh. 13 (1968 documents, pp. 27, 34, 66) (Oct. 12, 1968 from Justice Department to DHA attorney).

**32.** Dec. 12, 1988 Hearing: Pls. Exh. 2 (Report of the Task Force on Public Housing, Jan. 1983, pp. 22–23).

*Park Manor* (201 units). When *George Loving Place* in West Dallas started to become a predominately black unit,[33] a substantial number of white elderly tenants requested transfers from West Dallas to an "elderly-only" project. DHA got HUD approval for these transfers. In addition to reducing the number of whites in West Dallas, these transfers enabled DHA to open *Brook Manor* as a 100% white elderly unit.

The *Park Manor* elderly project opened in 1971 with a 79% black occupancy. That same year (1971), DHA also opened two "Turnkey III" projects: *College Park* (125 units) and *Bonnie View Estates* (107 units). Both of thee projects, of course, were 100% black. And, in 1974, DHA opened another white unit: *Cliff Manor* (185 units).

This meant that in 1974—after some 36 years of DHA's operations as an "arm of convenience" of the City of Dallas—DHA had:

(i) *Eight* all black units, plus *George Loving* (originally all-white) which was now 95% black *and Elmer Scott* (originally all-Hispanic) which was now 79.3% black;

(ii) only *one* Hispanic unit, *Little Mexico;*

(iii) only *three* white units (*Cliff Manor, Brook Manor* and *Cedar Springs*);[34]

(iv) *one* unit that was originally all-white, but which was now "mixed," *Washington Place* (54% black); and

(v) only *one* public housing unit that had not started as all-white or all-minority, *Park Manor* (which began as a 79% black unit in 1971 and which was 88% black in 1974).

However, with its illegal "Freedom of Choice" plan, DHA managed to convert *Park Manor* into a 95% black unit by 1977 —and *Washington Place* into an 82% black unit in 1982, just three years before it was demolished.[35]

### 8. *A Slight Change of Heart in 1974: The Community Development Block Grant Program*

On August 22, 1974, the federal Community Development Block Grant Program ("CDBG") came into existence. Under this HUD-administered program, the City of Dallas was to receive some $195 million over the next 15 years. *The CDBG program prohibited race discrimination by recipients,* 42 U.S.C. § 5309, so a "reform movement" concerning DHA was stimulated.

The Mayor appointed a new DHA Board. Then, in November of 1974, a City employee—William Darnall—became Acting Executive Director for DHA (while keeping his position with the City as Assistant Director for the Department of Housing and Urban Rehabilitation). An Assistant City Attorney was also provided to represent DHA.[36]

Darnall wanted to amend the DHA tenant assignment and selection plan so DHA could again receive federal funding from HUD. So, with the assistance of the City of Dallas Fair Housing Administrator, a City Fair Housing department law student intern, and the Assistant City Attorney, Darnall proposed a series of tenant selection and assignment plans.[37] The Board adopted these plans, and HUD did make a determination that DHA was finally in compliance with Title VI. However, by DHA's own admission, these new tenant

---

**33.** *George Loving* was 55% black in 1968, 72% in 1969, 87% in 1970, and 91% in 1971. Dec. 12, 1988 Hearing: Pls. Exh. 31.

**34.** In 1974, *Cedar Springs* was 7.5% black and *Little Mexico* was 4% black. Dec. 12, 1988 Hearing, Pls. Exh. 31.

**35.** Similarly, *Elmer Scott* would be 85% black in 1975 and 94% black by Oct. 1988.

**36.** Dec. 12, 1988 Hearing: Pls. Exh. 92 (Darnall/Bacon documents, pp. 7, 5, 10–11). Darnall served as Acting Executive Director from

Nov. 26, 1974 to July 1, 1975, when he was employed by DHA as its Executive Director. The Assistant City Attorney acted as DHA's lawyer for about eight months (from Oct. 1984 to July 1985).

**37.** Darnall had prepared the DHA's application for West Dallas rehabilitation funds before he became Acting Executive Director for DHA. He knew that one conditions for receiving these funds was to adopt a legal tenant assignment plan. However, the Darnall plans were, in effect, rejected by HUD in 1980.

assignment plans—drafted and proposed by City of Dallas employees—really did nothing to offer the black residents of DHA projects an opportunity to move into desegregated housing.

Indeed, the tenant assignment and selection plans were still discriminatory when this suit was filed in 1985. In the Consent Decree, DHA agreed to revise these plans, and finally—after still more delay by DHA—did so in after July of 1987.[38] This meant that DHA had operated with illegal tenant assignment plans for over 30 years (from at least 1955 through 1987)—which maintained the segregated nature of public housing by assigning tenants to projects on the basis of their race. And, the City of Dallas—through the direct involvement of its City Attorney in the DHA–HUD dispute over tenant assignment plans (1965–1974), through its threatened loss of federal funds in 1967, and through its employee (William Darnall) who drafted a new plan in 1975—was fully aware of these deliberate segregation policies of DHA.

### 9. *Public Housing In Dallas: 1975–1986*

#### *... the § 8 program*

In 1975, DHA began to operate its § 8 assistance program which provided rent subsidies to tenants seeking low-income housing—and which certainly provided DHA with an opportunity to desegregate its public housing by moving black families into non-minority areas in Dallas and its suburbs.

Indeed, in 1978, DHA's own attorney stated in a letter to HUD that DHA not only had the authority to honor § 8 certificates in the suburbs, but it also had the constitutional duty to do so to help correct the effects of its past racial discrimination. However, DHA allowed only a few tenants to go to the suburbs—and, subsequently, it completely refused to honor § 8 certificates in the suburbs.

In February of 1980, HUD advised DHA that it had to adopt a new tenant assignment and selection plan which would comply with Title VI. Specifically, DHA was notified that:

(i) Title VI requires DHA to remedy the situation under which white tenants find other public housing, while black families must rely on DHA for housing assistance;

(ii) *DHA's § 8 program should be used to increase housing opportunities for current DHA minority tenants, so non-minority applicants could be placed in the resulting project vacancies,* thus reducing the segregated nature of DHA's entire program.

DHA's primary response to HUD's demand was to adopt a new policy which required persons who were tenants at any DHA project to wait for 90 days *after vacating their apartments* before they were eligible to apply for § 8 assistance. Obviously, the practical effect of this policy was to prohibit DHA's black tenants from using the § 8 program—since few public housing families had the resources necessary to move into private housing for the 90–day waiting period.

DHA also adopted a revised tenant selection and assignment plan. However, it contained nothing which would allow black DHA tenants to use the § 8 program to move into non-segregated housing. This plan did receive local HUD approval, but there is no record of it ever being submitted for national HUD approval.

#### *... § 8 elderly projects*

In 1979 and 1980, DHA was completing two § 8 new projects for the elderly: *Lakeland Manor* (172 units) and *Forest Green Manor* (252 units). Instead of using the regular applicant waiting list (18% black), DHA used a special waiting list composed of persons who had specifically requested *Lakeland Manor;* that list was 7% black, so when *Lakeland Manor* opened in 1980, it was only 3.6% black. Similarly, when *Forest Green* was opened in 1980, it was 16% black. In 1981, DHA opened a § 8 Rehabilitation project for the elderly: *Oakland Apartments* (56 units). It was located in a black neighborhood and was 100%

---

**38.** See this Court's opinion in *Walker I.*

black. Then, in 1984, *Audelia Manor* (123 units) was opened as an elderly project; it was a white project (with a 9.8% black occupancy when this suit was filed in 1985).

From 1982 through 1986, *DHA continued to assign most elderly whites to its "white" projects—and most elderly blacks to its "black" projects.* This resulted, of course, in predominately one-race projects for the elderly in need of public housing. For example, when this lawsuit was filed in 1985, *Park Manor* was 93% black and *Oakland Apartments* was 94% black—while *Lakeland Manor* was 95% white, *Audelia Manor* was 90% white, *Cliff Manor* was 85% white, *Brook Manor* was 80% white, and *Forest Green* was 74% white.

### 10. Not In My Neighborhood—Chapter Three (1978)

In 1978, DHA received authorization from HUD to construct 224 new units of low rent public housing ("LRPH"). If these units had been constructed in non-impacted areas, DHA would have been able to offer black tenants a choice of housing outside of minority areas.

Instead, the City of Dallas—acting through its City Manager and an Assistant City Manager—successfully obstructed the development of these 224 LRPH units on "scattered sites" in non-impacted areas of Dallas. Specifically:

(i) the DHA proposals were vetoed because the number of units exceeded the maximum allowed (80 units) under "the current year goal" set for the City's Housing Assistance Plan; and

(ii) the City's Housing Plan formally declared that Dallas would accept no more than its "fair share" of federally-assisted housing.

When the suburb cities refused to accept any of the 224 units, the City of Dallas also rejected this needed public housing. Finally, in 1980, HUD revoked the authorization for these 224 units.

### 11. Not In My Neighborhood—Chapter Four (1982–1986)

There was one break in the unrelenting segregation by DHA in its public housing projects and § 8 programs. It occurred as the result of a 1982 lawsuit which challenged the sale of *Washington Place* to Baylor University Medical Center—and the consequent demolition of the 347 units of public housing at *Washington Place.* In the settlement of this suit (filed by *Washington Place* tenants), DHA and HUD agreed to a "one-for-one" replacement of these 347 units in this manner:

(i) rehabilitation of "the 91 units at the DHA owned apartment complex known as *Simpson Place* " (which was adjacent to *Washington Place*);

(ii) rehabilitation of 150 units in the "Near East Dallas Neighborhood" with the use of § 8 Modern Rehab funds; and

(iii) construction of 106 units of new low-rent public housing with funding provided by HUD.

DHA did rehabilitate *Simpson Place* (with 92 units); this project was 100% black when it opened in 1985, but the black occupancy rate dropped to 64% in 1986. Also, the § 8 Moderate Rehab units were used to modernize *Town Park* (with 156 units) in a predominately white area on Shadyside Lane in East Dallas; *Town Park* was 57.2% black when it opened in 1985.

There was *substantial opposition* to the location of *Town Park* in East Dallas. However, unlike the previous *"Not in My Neighborhood"* opposition to public housing—it's not in the "Negro residential areas" set by City ordinance (Chap. One, the Haskell–Dolphin location in 1950); they are not going to be put in West Dallas (Chap. Two, the 3000 new units proposed in 1962); we'll only accept our "fair share" of public housing (Chap. Three, the 224 new units proposed in 1978)—the opposition took a new form in the 1980's. For example, the "Lakewood Homeowners Association" vigorously argued:

... *Town Park* is *too far from adequate facilities* for the poor, such as grocery stores, retail shops, laundromats, hospitals, etc.

... there is not *adequate public transportation* for low-income tenants at *Town Park;*

... the selection of *Town Park will not further desegregation* of public housing;

... there will be an *adverse effect on the public schools* in this neighborhood;[39] and

... it is a "bad deal" because *DHA is paying too much* for *Town Park.*

These very same objections would be raised, *again and again,* to other public housing proposed in non-minority areas—including the numerous sites considered by DHA for the 106 replacement units for *Washington Place* and the 100 units of new public housing required by the Consent Decree in this case.[40] *And, this is understandable.*

No one wants low-income public housing in their neighborhood, certainly not a project that may be predominantly black. *It should be placed in someone else's neighborhood—or just kept in the minority areas of town,* as has been done historically by DHA (with the support of the City of Dallas). However, unless this pattern is broken, then public housing in Dallas will continue to be segregated—and, as the inevitable corollary, public housing for minorities will continue to be substandard, at best, and it will never even approach the quality of low-income housing being provided for whites.[41]

Another recurring objection to public housing in *my* neighborhood—one that is not without justification in light of the miserable history of public housing in Dallas—is that DHA will not properly maintain these low-income projects, so they will rapidly deteriorate into eyesores and slums, and dramatically increase the crime rates in their neighborhoods.

*But does this have to be true?* What if political and neighborhood opposition—like that which opposed the location of the *Town Park* and *Country Creek* projects in non-minority areas—were directed at DHA's failure to properly operate and maintain these units? And at the City of Dallas, as well, for not requiring DHA to do so? *Is there any real doubt that such political and neighborhood opposition would be effective*—and that it would prevent the deterioration of public housing projects like *Town Park* and *Country Creek?*[42]

### 12. *Not In Any Neighborhood—Chapter Five (1984–1988)*

As discussed above, the *Washington Place* settlement in 1984 also provided for the construction of 106 units of new low-rent public housing. Under the April 14, 1984 Agreed Judgment, these were to be located in "non-minority impacted areas," and DHA agreed to "make all reasonable efforts to complete site selection" within 6 months (i.e., by Oct. 14, 1984)—and to have the 106 units ready for occupancy within two years (i.e., by April 14, 1986).

Of course, DHA did not meet either of these deadlines. At the Sept. 18, 1987 hearing, DHA Executive Director Jack Herrington testified about the various sites that had been considered by DHA for the *Washington Place* units—but rejected in the face of political and neighborhood opposition.[43]

---

**39.** Overcrowding is the "adverse impact" upon the schools if a low-income housing project is placed in a non-minority area; but under-utilization of the schools is the "adverse impact" if units are demolished at an all-black project. Compare the opposition to *Town Park* with the inconsistent opposition to *Country Creek* and the demolition of units at West Dallas. DHA First Annual Report (Jan. 20, 1988), pp. 54–55; Sept. 18, 1987 Hearing: Testimony of Jack Herrington; presentation by Sidney Stahl, attorney for the Oak Cliff Chamber of Commerce.

**40.** Compare the *Town Park* opposition (Pls. Exh. 14) to the opposition that DHA met in connection with the *Washington Place* units and with the selection of the *Country Creek* site. Sept. 18, 1987 Hearing: Testimony of Jack Herrington. And see this Court's opinion in *Walker I.*

**41.** That is, both the "white" elderly projects of DHA and the public housing assistance which low-income whites have been furnished by HUD outside of the DHA programs. Dec. 12, 1988 Hearing: Testimony of Craig Gardner; Pls. Exh. 35; Pls. Exh. 36; Pls. Exh. 39 (summary of location and occupancy characteristics of *HUD*-assisted projects in Dallas County).

**42.** These are intended merely as rhetorical questions, not as a sermon. But in any event, they are certainly not findings of fact, and they do not form the basis for any finding of fact or conclusion of law in this opinion.

**43.** Sept. 18, 1987 Hearing: Testimony of Jack Herrington; Rulings of the Court, pp. 1–4. One of the sites rejected for these 106 units, because of neighborhood opposition and political pressure, was *Country Creek*—which DHA, at the

Finally, in August of 1984—two months before the site selection deadline—DHA asked HUD to approve the placement of these 106 units at its existing *Cedar Springs* project. It did this with full recognition of the fact that this violated the Agreed Judgment because *Cedar Springs* was located in an impacted area; indeed, a May 1984 DHA memo to Executive Director Herrington stated:

> "Both projects [Cedar Springs and Little Mexico] are located in census tracts which are, in HUD's definition, impacted. We may be able to fight that through EO if we can group several tracts in the area together and show an 'integrated' racial balance. This will be subject to arbitrary decisions here and at HUD."

At this time, *Cedar Springs* (385 units) was located in a census tract which was 48.3% minority; although *Cedar Springs* was only 29% black in 1984, by 1985 it was 37% black and by 1987 it was 51% black.

Nevertheless, DHA requested the City of Dallas to amend its CDBG Housing Assistance Plan to allow these 106 units to be constructed at *Cedar Springs* site. *The City complied with this request.* However, HUD rejected this, as well as the City's attempted modification of its Housing Assistance Plan, because the *Cedar Springs* area "is lower income and contains a high proportion of assisted housing units"—and, therefore, was not a "location acceptable for construction" of the 106 new units.[44]

Then, in Oct. 1985—one year after the deadline for completion of the 106 units—DHA sought help from the city in locating these *Washington Place* replacement units in non-impacted areas; specifically, it asked permission to use $300,000 in CDBG funds—that had already been awarded to DHA—to help in the acquisition of sites outside of minority areas. However, the City refused this request on the grounds that this proposal did not meet the intent of

the City's initial grant for the use of this $300,000.

Finally, in 1987—over three years after the deadline for site selection—DHA managed to purchase five "scattered locations on which the 106 replacement units will be constructed. There was, of course, opposition to these five sites by neighborhood groups and local politicians because "no one wants public housing in their neighborhood."

### 13. *Housing Quality Inspections (1978–1988)*

Beginning in 1978, the City of Dallas conducted many of the Housing Quality Standards inspections for DHA's § 8 programs. The city inspectors consistently approved units for black families, and in black neighborhoods, which were in flagrant violation of HUD Housing Quality Standards. Indeed, between Jan. 20, 1987 and Jan. 20, 1988, DHA's quality control inspections found that 60% of the units which had previously been inspected and "passed"—*most by city inspectors*—did not meet Housing Quality Standards upon reinspection.

Moreover, even when the City did fail a unit for quality violations, *it took no action to bring code enforcement proceedings against the landlords.* The city inspection process has, without question, been a major factor causing the both the segregation of black § 8 tenants and the substandard quality of the housing received by blacks when compared to the quality of the housing of white DHA tenants.

### 14. *The City's CDBG Program (1974–1988)*

The Dallas Housing Assistance Plan, filed under the Community Development Block Grant Program, lists a number of activities that purport to qualify the City for the $15 million per year in CDBG

---

Court's direction, selected in Sept. 1987 for the 100 new LRHP units required by the Consent Decree in this case. See the *Walker I* opinion.

**44.** Dec. 12, 1988 Hearing: Pls. Exh. 42 (16 unit documents, pp. 15–25). However, Assistant City

Manager Harry Jones candidly testified that placing these 106 units at Cedar Springs would not have served "the goal of increasing housing opportunities for minorities outside of areas of low income and minority concentrations." Pls. Exh. 66 (Jones deposition, pp. 11–12).

funds. Yet, the City does not review these activities to determine if they are increasing open housing opportunities or furthering the critical goal of fair housing. In fact:

> ... the City of Dallas has no policy to encourage the location of low-income housing outside of minority areas;
>
> ... according to the Assistant City Manager with housing responsibilities, there is not even one City activity that is specifically directed at the goal of increased open housing opportunities; and
>
> ... the City's own reports to HUD list only one item, "helping to sponsor a fair housing *poster contest*," under its obligations to further "fair housing." [45]

Moreover, the City's "fair housing" enforcement has been almost non-existent. The total housing enforcement staff was one half-time Housing Administrator and one half-time worker until 1989—when Assistant City Manager Harry Jones was finally able to get an increased budget and four new employees for the "fair housing" staff.[46] There have been no prosecutions filed, and no settlement agreements reached, under the "fair housing" ordinance since at least 1981. And, the City has chosen to effectively exempt DHA and other federally assisted housing providers from its enforcement activities.

In addition, despite requests from HUD, the City has failed to request "substantially equivalent status" for its "fair housing" program. If the City had done so, it would be receiving federal funding for its fair housing effort. 24 CFR Part 111. However, the City's present "fair housing" ordinance does not meet the standards for recognition as a "substantially equivalent" ordinance because of its substantive and procedural weaknesses. 24 CFR §§ 115.3, 115.4.[47]

Finally, with respect to CDBG funds which have been given to DHA, the plaintiffs contend:

> "Past City grants of CDBG funds have been given to DHA when it was engaged in overt segregation and without requiring an end to the segregation and its effects. This must be compared with the City's refusal to provide funds for DHA's present desegregation effort. *The City is willing to fund segregation, but not its elimination.*"

Unfortunately, as is shown by this "history" of segregation in public housing in Dallas, this contention is true.[48] It is also inexcusable.

15. *The Robin Square Apartments (1980–1988)*

In 1980, DHA submitted an application to HUD for § 8 Moderate Rehabilitation Pro-

---

**45.** Dec. 12, 1988 Hearing: Pls. Exh. 67 (Harold Wasson deposition, pp. 19–20, 24–25); Pls. Exh. 66 (Harry Jones deposition, pp. 33–37); Pls. Exh. 58 (City reports of actions to further fair housing). Assistant City Manager Harry Jones did testify that HUD has conducted an annual audit of the City's "fair housing program." However, effective Sept. 1988, a HUD regulation sets standards for determining whether a CDBG recipient has complied with the duty to "affirmatively further fair housing"; under this regulation, the City will be required to conduct its own analysis of its CDBG programs.

**46.** This opinion is not intended to reflect in any way upon Assistant City Manager Harry Jones— who is obviously a very dedicated, extremely competent, and very concerned City employee; *if Mr. Jones had been given adequate resources by the City, he would have corrected many of the problems that existed with the inspection and "fair housing" programs. Harry Jones is also very credible and, at times, painfully honest.* See, e.g., Dec. 12, 1988 Hearing, Tr. 110, 121. See also Dec. 12, 1988 Hearing: Testimony of

Harry Jones, Tr. 33, 45, 104–106, 109); Pls. Exh. 67 (Harold Wasson deposition, pp. 9–10, 17, 24–25); Pls. Exh. 66 (Harry Jones deposition, p. 33).

**47.** Dec. 12, 1988 Hearing: Pls. Exh. 67 (Harold Wasson deposition, pp. 21–23); Pls. Exh. 85 (City of Dallas Fair Housing Ordinance); Pls. Exh. 93 (City memo on "substantially equivalent status"). Assistant City Manager Harry Jones did testify that the City planned to seek "substantially equivalent status," probably in 1989. Testimony of Harry Jones, Tr. 33–34.

**48.** See, e.g., the City's refusal to permit DHA to use CDBG funds for the housing mobility and relocation benefits provided in the Consent Decree in this case—but promising the use of CDBG funds for street and gutter improvements so § 8 Modern Rehab funds could be obtained in 1980 for the all-black *Robin Square Apartments* near Fair Park. Dec. 12, 1988 Hearing: Pls. Exh. 40 (*Robin Square* documents, pp. 52–53).

gram ("Moderate Rehab") funds—*based on the explicit certification that units located in an area of minority concentration would not be selected for the program.* The City of Dallas Housing and Urban Rehabilitation Department was a co-administrator of this program.

However, these § 8 Moderate Rehab funds were used only to "rehabilitate" housing in minority and low income areas.[49] For example, the City of Dallas—through two different City Managers—supported DHA's use of § 8 Moderate Rehab funds at the *Robin Square Apartments* near Fair Park. The *Robin Square* site met none of HUD's site selection requirements: it was located in a blighted, minority and low-income concentrated area; it had consistently failed Housing Quality Standard inspections; and it had even been rejected in 1979 by DHA as an appropriate location for public housing.

Nevertheless, § 8 Moderate Rehab funds were used to *supposedly* renovate 156 apartments at *Robin Square*. Yet, in a 1987 lawsuit filed by tenants of *Robin Square* against DHA and the landlord of these apartments[50]—because the project had not been maintained in a decent, safe, and sanitary position for years—*DHA Executive Director Jack Herrington testified that the conditions at Robin Square have never met the DHA standards for the quality of housing should be provided to DHA tenants.* Herrington also testified:

"Q. At the time you were considering *Robin Square* for this moderate rehab participation, was the neighborhood a desirable one?

A. No.

Q. Is it a desirable neighborhood today?

A. No.

Q. *Has it ever been a desirable neighborhood?*

A. *No.*

Q. As long as it's been on the moderate rehab program?

A. No.

Q. *Did you ever take a position opposed to the use of Robin Square as a moderate rehab project site?*

A. *No.*

Q. Did anyone at DHA ever take a position opposed to the use of *Robin Square* as a moderate rehab program site?

A. The official position of the authority would have been mine, so I would answer that no."

Herrington's testimony in *Banks*—that even though *Robin Square* was totally unsuitable, he did not oppose its use for the § 8 Moderate Rehab assistance—*might* be explained by the plaintiffs' allegation in that case that:

"In conversations during 1981 between Jack Herrington and local HUD officials about the inclusion of *Robin Square* as a § 8 Moderate Rehab project, Herrington explicitly stated that he wanted *Robin Square* on the program in order to avoid placing units in the white part of town targeted by the Moderate Rehab application. Herrington stated that he was under political pressure [from certain members of the Dallas City Council] to keep the units out of white neighborhoods."[51]

This allegation was supported by the Affidavit of Elbert T. Winn, filed in support of the plaintiffs' request for a preliminary injunction in the *Banks* case. In addition to reciting certain statements which Herrington supposedly made about local political pressure—*statements which Herring-*

---

**49.** The § 8 Moderate Rehab Program of DHA and the City resulted in a 90.6% black occupancy rate, with projects located only in minority and low-income impacted areas. Dec. 12, 1988 Hearing: Pls. Exh. 37; Pls. Exh. 40.

**50.** *Banks, et al. v. Robin Square Apartments,* CA 3–87–1713–R (N.D.Tex.).

**51.** Plaintiffs' Statement of Evidence in Support of Motion for Preliminary Injunction, p. 14

(*Banks,* CA 3–87–1713–R). The choice of *Robin Square* is certainly not explained by Herrington's statements that he or City employees thought *Robin Square* "might improve that section of the community" (Pls. Exh. 40, p. 11) because that is directly contrary to DHA's certifications to HUD (Pls. Exh. 40, p. 20) and to the facts about the condition of *Robin Square* (see Pls. Exh. 40, pp. 84–86, 101–105, 109–110, 128–133).

*ton denies making,* in his affidavit also filed in *Banks*—Elbert Winn, the Deputy Manager of the HUD Dallas Area Office in 1981, described the reaction of the local HUD officials to the *Robin Square* project:

"Irving Statman [HUD Dallas Area Manager] initially responded to Herrington's request for HUD approval by objecting to the location and the condition of the [*Robin Square*] project. Statman referred to the project as 'cruddy' and 'horrible' and said 'This project has been sent to us so many times, it's a pity. It should be torn down.' Statman also told Herrington that 'the site and neighborhood standards will not permit us to do this.' Statman was referring to the § 8 Moderate Rehabilitation Program site and neighborhoods and their application to the *Robin Square Apartments.*

"Statman told Herrington that HUD would approve the *Robin Square* site only if the City of Dallas would write a letter endorsing the inclusion of the *Robin Square Apartments* as a Moderate Rehabilitation project and strongly enforce its housing codes in the area...." [52]

The Dallas City Manager did, in fact, write the letter requested by Statman; and, because of the City's support, HUD approved the use of the § 8 Moderate Rehab funds for *Robin Square*—a "cruddy" and "horrible" project which "should have been torn down." [53]

The credibility dispute between Winn (HUD) and Herrington (DHA) concerning "political pressure" on Herrington—which *does not* form the basis for any finding of fact in this opinion—was not resolved in *Banks.* Neither Winn nor Herrington testified in that case. Instead, on June 13, 1988, an agreed injunction was entered in favor of the plaintiffs which, in substance, gave them rights to move out of *Robin Square* immediately with the use of § 8 certificates. Then, on October 4, 1988, HUD instructed DHA to cancel its contract with the owner of *Robin Square;* and, DHA did this effective November 1, 1988— *just six years after Robin Square had been opened as a § 8 Moderate Rehab project in a deteriorating all-black neighborhood at the instance of DHA and with support of the City of Dallas.*

### 16. *The West Dallas Project (1975–1988): A Gigantic Monument to Segregation and Neglect*

The West Dallas project was not a "solution" to anything, much less the "Negro Housing Problem." It is, instead, *"a gigantic monument to segregation and neglect."* [54]

#### ... *a publicly-owned slum*

By 1975, after only 20 years of existence, the West Dallas project had become "a publicly-owned slum." The housing was in horrible condition because no money had been spent on maintenance and rehabilitation for over ten years [55]—the period during which DHA received no federal funding because both the City and DHA felt it was more important to continue the segregation of public housing in Dallas. [56]

There were numerous vacancies in the West Dallas project, and many of these vacant units had been boarded up because

---

**52.** Statement of Elbert T. Winn, Pls. Exh. 6 to the Plaintiffs' Statement of Evidence in Support of Motion for Preliminary Injunction, filed May 23, 1988 in *Banks,* CA 3-87-1713-R. *The statements just quoted were not denied in the Herrington Affidavit filed in Banks on June 14, 1988.*

**53.** In connection with the entry of the agreed injunction in *Banks,* one of the participants made this comment: "If a tornado were to hit the *Robin Square Apartments,* it would do over $5.5 million *in improvements."*

**54.** Jan. 2, 1987 letter to the Court by Dallas City Council Members Al Lipscomb and Diane Ragsdale.

**55.** Without the $31 million that was forfeited from 1969 through 1974, "DHA management attempted to preserve financial soundness at the expense of physical maintenance. The physical condition of DHA properties [such as West Dallas] deteriorated rapidly and most projects have never been returned to the condition they were in before ..." Dec. 12, 1988 Hearing: Pls. Exh. 2, pp. 22–23. See part 6 above, *"Assignments of Tenants by Race (1965–74): The Loss By DHA of over $31 million."*

**56.** Because of this policy of deliberate segregation, West Dallas was over 95% black in 1975. Dec. 12, 1988 Hearing: Pls. Exh. 31.

they were unfit for human occupancy.[57] And, this was not surprising because:

(i) persons who lived at West Dallas were almost 5 times as likely to be murdered as other Dallas residents;

(ii) rapes were over 6 times more frequent in West Dallas than in other parts of the City;

(iii) according to Dallas police officers, drug dealing was rampant at West Dallas, and hundreds of transients were hiding or living in the vacant units; and

(iv) there were substantial health risks because a large portion of the project had been subjected to serious lead contamination by a nearby lead smelter.[58]

Because of these conditions, West Dallas was not a "solution." It was a problem—a very serious and incredibly difficult problem that defied every effort to remedy the "publicly-owned slum."

#### ... the "quick fix" in 1976

In 1976, DHA obtained $13 million from HUD as a "rehabilitation grant" for the West Dallas project. However, this money was totally inadequate since it gave DHA only $3,700 to spend on each of the 3500 units at West Dallas—instead of the $22,000–25,000 per unit that has been required for the rehabilitation of other public housing projects in Dallas.[59]

Moreover, because of mismanagement and incompetence—if not theft and fraud—the grant resulted in little, if any, improvement of the West Dallas project. Indeed, after the $13 million was spent, there were still approximately 1,300 units at West Dallas that were vacant and uninhabitable.

57. HUD expressed concern about the high vacancy level at West Dallas as early as 1963. DHA responded by claiming that it was considering modernization of the project, providing day care, and "creating small community areas within each project" to develop tenant pride in these areas. Dec. 12, 1988 Hearing: Pls. Exh. 10, pp. 5–8.

58. Findings of Fact and Conclusions of Law Approving the Consent Decree, pp. 9–13 (filed Jan. 20, 1987).

59. A 1980 survey funded by the City of Dallas estimated that it would cost $47.8 million for the complete rehabilitation of West Dallas. Dec. 12, 1988 Hearing: Pls. Exh. 46, (Millkey &

#### ... The 1983 "master plan" (and others)

In 1983, the 1983 City Task Force on Public Housing found:

(i) that at least 35% of the West Dallas units were so deteriorated that they were uninhabitable; and

(ii) "The underlying assumption for upgrading the West Dallas projects is that *simply rehabilitating the housing units will not solve all the problems.* The large concentration of units in the West Dallas area has created poor security conditions and the overall perception that West Dallas is not a desirable place to live. The revitalization strategy must attempt to reverse this perception through provision of not only decent housing but also retail centers, security, and jobs."

In that same year (1983), DHA prepared a "master plan" for the rehabilitation of the West Dallas project *and the revitalization of the surrounding community.* The cost for this plan was $88 million.[60] However, DHA was not able to get anyone—HUD, the City of Dallas, or private sources—to agree to contribute any financing for this $88 million master plan.

Accordingly, later in 1983, DHA applied to HUD for $54 million to rehabilitate all of the West Dallas units. HUD refused, and gave notice to DHA that it would provide only $18 million for this project—and that it would provide this amount only upon the conditions (i) *that DHA would not apply for any more HUD funds for West Dallas;* and (ii) that DHA would submit a workable plan that would restore both the Project and the surrounding community to "viability."[61]

Brown Study of West Dallas Project, pp. 20, 39, 59).

60. The plan would have reduced the number of low-income units at West Dallas from 3,500 to between 1,400 and 2,000. Dec. 12, 1988 Hearing: Pls. Exh. 49 (Lake West Master Plan, pp. 78–86).

61. Dec. 12, 1988 Hearing: Pls. Exh. 50 (West Dallas modernization documents). Under the HUD "viability" requirement, DHA would have to show that both it *and* the City of Dallas would improve the community by correcting the crime problem, the physical deterioration of the neighborhood, and the concentration of federally-assisted housing in the area. Pls. Exh. 50, pp. 7–10.

Then, in 1984, the "Mayor's Task Force on Public Housing" recommended that the City of Dallas use CDBG funds to rehabilitate 200 West Dallas units a year, *at-below-minimum standards,* for a per-unit cost of $7,000. There is serious question whether this minimum rehabilitation would have met HUD's standards for "viability." In any event, the City Council refused to commit even this amount—a total of $24.5 million over 17.5 years—and it rejected the Task Force proposal.

*... just before the Consent Decree*

The conditions at West Dallas in late 1986, just before approval of the Consent Decree in this case, were summarized by the testimony of DHA Executive Director Jack Herrington at a Congressional Subcommittee hearing:

> "In the three West Dallas housing projects—*George Loving Place, Edgar Ward Place and Elmer Scott Place*—there is an urgent need to reverse 30 years of wear, deterioration, vandalism, poor maintenance and inadequate funding. The overall housing conditions and 1,200 vacant, uninhabitable units have a negative impact on surrounding neighborhoods, business, industry and the city as a whole. *More than 8,000 adults and children live in a square mile area which has become, in many respects, a publicly owned slum."*

Because of the appalling conditions at West Dallas—housing that was barely fit to live in; almost 1300 vacant units that were boarded up; severe problems with drug dealers, with other crimes, with transients, and with vandalism; health risks due to lead contamination; a bitter life with roaches and rats and rubbish; and little or no hope that these things would change— people in need were refusing to accept housing in the West Dallas project. In 1986, the rejection rates for *George Loving, Edgar Ward and Elmer Scott* ranged from 58% to 60%; and, this was true even though the DHA staff had been instructed to deny any housing assistance to a family

that refused to take a unit in West Dallas.[62]

And, because of the same horrible conditions, a substantial number of the West Dallas tenants wanted to get out of the project. Evidence at the Dec. 12, 1986 fairness hearing established that as many as 85% of the tenants at West Dallas wanted to move out of the "publicly-owned slums" and that from 15–20% of the tenants left West Dallas *each* year. As one of the plaintiffs (Mary Dews, a counselor for the Dallas Tenants Association) testified:

> "... It was an awful experience. She talked about taking her own life if she couldn't do better and she did not want to take her family to West Dallas. She was just that firm about it. She did not want West Dallas....
>
> "... [And] many of the tenants [at West Dallas] come into the office and ask for housing or want to relocate or want to transfer. And because of the 90–day policy it's real hard ... very hard, next to impossible. *And they begin to cry. They talk about things like seeing children raped and syringes outside, the children going outside and picking up the syringes.* And they want a better lifestyle for their children and for themselves. It's just—it's heart breaking, [*they*] *just break into tears and start crying 'WE WANT OUT!'* "

At the time of the entry of the Consent Decree (Jan. 20, 1987), there were 1,917 black families subjected to these conditions at West Dallas. The remaining 1,583 units at West Dallas were vacant, and almost 1,300 of these had been boarded-up for at least ten years because they were *not fit for humans.*

17. *Summary: "This City Has Not Been Kind to the Poor and to Minorities"*

It is obvious, from this history of public housing in Dallas, that the City knew of DHA's deliberate discrimination and segregation in its § 8 assistance programs and in its public housing projects. The City of

---

**62.** Dec. 12, 1988 Hearing: Pls. Exh. 51, p. 2; Pls. Exh. 52 (DHA summary of West Dallas rejection rates). On March 25, 1988, DHA began offering West Dallas units to new applicnts on a voluntary basis; however, from that date until Oct. 31, 1988, only 21 persons out of 1000 applicants (2.1%) chose to move into West Dallas. Dec. 12, 1988 Hearing: Pls. Exhs. 55–56.

Dallas could have intervened to stop these illegal practices of DHA—but it did not.

In addition, the undisputed facts establish that the City itself was a substantial cause of this racial discrimination in public housing in Dallas. These are just some of the examples discussed above:

... the City Manager selected the site for DHA's first "Negro" housing project;

... the Mayor (and City Council) requested DHA to construct the 3500–unit West Dallas Housing project, as a solution to the "Negro Housing Problem" of the 1950's, in order to kkep blacks from moving into "white areas of the city";

... because of the City Council's opposition, the additional 3,000 units of public housing available in 1962 were denied to those in need of low-income housing;

... because of the City support for (and the active participation of the City Attorney in) DHA's illegal tenant assignment and selection plans, DHA was permitted to forfeit over $31 million in federal funds from 1969 to 1974—and this loss resulted in the rapid and irreversible deterioration of every DHA housing project, including West Dallas;

... the City blocked DHA's development of the 226 units of needed public housing that were available in 1978;

... the City did nothing to help DHA locate sites for housing in non-minority areas or to help DHA use § 8 programs to move black public housing families out of minority areas;

... the City supported the opposition to DHA's efforts to locate the *Town Park* and *Country Creek* projects, and the 106 *Washington Place* replacement units, in non-impacted areas;

... the City has taken no action to correct the sub-standard quality of DHA housing by the use of code enforcement proceedings;

... the City has done very little to enforce "fair housing," or to increase the housing opportunities for the poor outside of minority areas, despite its obligation to do so under its CDBG program;

... the City, despite DHA's policies of blatant discrimination, has made (or promised) grants of CDBG funds to DHA when the particular project furthers segregation (e.g., *Robin Square*), but has refused CDBG grants to DHA for efforts to correct its past policies of discrimination (e.g., funding for the mobility and relocation benefits under the Consent Decree in this case); and

... the City simply continues to refuse to recognize that it has *any* responsibility to help solve the monumental problems that are the legacy of the City's mistake in having the West Dallas project built to keep at least 3,500 blacks out of the white areas of Dallas.

This, then, is a summary of deliberate segregation in public housing in Dallas by DHA and by the City itself. *It has not been a pleasant history to record.* But, if nothing else, it does demonstrate—as City Council Member Lori Palmer testified—that:

"... *This particular city has not been kind to poor people and to minorities.* It has not been kind in providing the adequate availability of low-income housing, and it has not been kind to the availability of housing for families with children in particular. *We are finding ... a major lack of low-income housing in our city, and we do not yet find the public will or the private will to change that ...*" (Dec. 12, 1986 Hearing, Tr. 24).

## IV. Conduct By The City of Dallas And Its Officials After The Consent Decree

The conduct of the City of Dallas, and some of its officials, after the Court's approval of the Consent Decree (Jan. 20, 1987), also supports the joinder of the City in this case.

### 1. Initial Participation and Support

The City of Dallas, of course, was not a party to the Consent Decree. However, the Mayor of Dallas (then, Starke Taylor) was instrumental in the settlement. He, lawyers from the City Attorney's office, and other City employees participated in the negotiations in 1986. The Mayor promised that the City would support the settlement and would assist DHA in meeting its

obligations under the Decree [63]—and DHA viewed the support and endorsement of the City to be essential to the success of the Consent Decree.

Indeed, without this assurance, neither the plaintiffs nor HUD would have entered into the settlement. The Consent Decree recognized that DHA needed resources to comply with all of its obligations under the Decree.[64] And, just as importantly—in view of the long, dismal history of DHA's deliberate racial discrimination and segregation—it is obvious that the plaintiffs wanted to have the City's support so DHA would honor its commitments under the Consent Decree. HUD had already recognized that the only successful attempts to desegregate public housing have taken place where "the City Council, the Mayor, the [Housing] Board, or some key political personage supported the effort." [65]

The City argues that Mayor Starke Taylor did not have authority to speak for the entire City Council. This is true. However, it is also true that *Starke Taylor was not acting as a private individual in the settlement negotiations—he was participating in his official capacity as the Mayor of Dallas.* It is also obvious that Mayor Taylor consulted with other members of the City Council, since a majority of the Council initially supported the Consent De-

cree. For example, DHA's First Annual Report (Jan. 20, 1988) to this Court under the Consent Decree contains this entry in the "Chronological Events" narrative (pp. 31–32):

> "*October, 1986:* DHA Executive Director and attorneys for Plaintiffs brief City Council on the Consent Decree. *It is viewed by local leadership as a welcome solution* to the longstanding community problems that West Dallas has caused since it was completed in the mid–1950's."

The "welcomed solution" was the complete renovation of 800–900 units at West Dallas; the demolition of at least 1300 units that had been vacant and uninhabitable for over ten years; the one-for-one replacement of *all* units demolished at West Dallas with § 8 assistance; and, using this § 8 program, the transfer of those who wanted to leave West Dallas into non-segregated housing in non-minority areas of Dallas and its suburbs. (See this Court' opinion in *Walker II*).

### 2. *City Opposition to The Decree*

This initial support by the City Council appeared to dissipate, in mid or late 1987,[66] in the face of opposition from an unusual combination of diverse groups [67] to the demolition of any units at West Dallas.

---

**63.** March 25, 1988 Hearing: Testimony of Jack Herrington (Mayor Taylor participated in the settlement negotiations, and his support was an important factor in concluding the settlement). Dec. 12, 1988 Hearing, Testimony of Assistant City Manager Harry Jones (Jones, the Mayor and two city attorneys participated in the negotiations), Tr. 32; Pls. Exh. 60, Mayor's letter of Nov. 5, 1986 to DHA Executive Director Herrington.

**64.** "The parties enter into this Decree on the explicit premise that the resources currently available to DHA to implement the Decree are inadequate. In order to implement the Decree, substantial resources will have to be made available from institutions and organizations other than DHA." Consent Decree, p. 2.

**65.** Dec. 12, 1988 Hearing: Pls. Exh. 30 ("Final Report/Feasibility Research for a Public Housing Desegregation Demonstration, May 15, 1985"); Pls. Exh. 29.

**66.** The first notice of the City's opposition in the DHA Reports to this Court stated: "*Nov. 5, 1987:* Executive Director attends meeting in Mayor

Strauss' office with the Mayor, Councilpersons, HUD representatives and those opposing the settlement. No decision results, but the position of HUD and DHA were made clear regarding a firm commitment to accomplish Decree objectives." DHA First Annual Report, p. 60 (Jan. 20, 1988).

**67.** Some groups objected to the West Dallas demolition—but not to any other part of the Consent Decree—for obviously political reasons, such as the loss of votes or a power base if blacks were moved out of West Dallas. Other groups sincerely objected to the demolition of any public housing. Still others were sincere in wanting the West Dallas demolition delayed, to see "if there were any alternative solutions." *But some groups objected to the attempted desegregation of public housing in Dallas;* they suddenly discovered how important it was to keep 3500 units of low-income housing for blacks in West Dallas (even though they had not been concerned with the 1300 units that had been vacant and boarded for over ten years).

And, ignoring the fact that the entire Consent Decree was being supported by those who mattered most—the black families who wanted out of the squalor, the crime, and the hopeless life in West Dallas [68]—the City of Dallas, and its elected officials and employees, began to oppose the Decree and to obstruct it in various ways.

First, the Mayor of Dallas—acting in her official capacity as Mayor [69]—contacted both local and national HUD officials to oppose any demolition in West Dallas. Second, the Mayor and other City Council Members supported "the Frost Amendment," which purports to deny federal funding for the West Dallas demolition.[70] Third, the Mayor appointed Mattie Nash, an avowed and dedicated opponent of the Consent Decree, to the DHA Board of Commissioners.[71]

Fourth, not only has the City of Dallas refused to do anything to support the Decree,[72] or to help stop the massive violations of the Decree by DHA (see the *Walker I* opinion), it has actually contributed to some of these violations—by continuing to approve substandard housing for use in the DHA's § 8 programs and by failing to use code enforcement proceedings to remedy these Housing Quality Standard violations.[73]

Finally, the Mayor and some City Council Members have opposed both the construction of the 100 units of new public housing at the *Country Creek* site and the demolition of any units at West Dallas.[74] Although this Court certainly does not question the sincerity of this opposition, *one cannot help noting that consistency is not a requirement for opposing the Consent Decree:*

(i) some oppose the location of the 100 units at *County Creek* because this is "simply too large" a project for low-income public housing;

(ii) but they also oppose the demolition of *any* of the 3500 units at West Dallas—even those that have been vacant and boarded-up for over 10 years be-

---

**68.** Of the 1,917 black families at West Dallas when the Consent Decree was approved, *598* moved out of West Dallas during the first year of the Decree—with some 231 of these relocating with the use of § 8 assistance. DHA First Annual Report (Jan. 20, 1988). *From March through Oct. 1989, the rejection rate for West Dallas was almost 98%.* By October of 1988, there were only 1,074 occupied units at West Dallas, and the number of families who want to stay in West Dallas seem to have stabilized between 1000–1075. DHA Reports to the Plaintiffs, Jan.–Dec. 1988; DHA Report No. 7 to the Court (July 20, 1989). Dec. 12, 1988 Hearing: Pls. Exhs. 55, 56.

**69.** *This Court certainly does not mean to suggest that the opposition by the Mayor and other City Council Members was not sincere and for reasons that they felt valid.* Indeed, in early 1988, the Mayor appointed a "Housing Mediation Team" which met, under the Court's supervision, with the plaintiffs, DHA, and City of Dallas attorneys in an attempt to resolve the controversy about the West Dallas demotion part of the Decree. And, Council Member Lori Palmer's opposition to the Consent Decree was based, in part, on her belief that—unfortunately—Dallas was simply not ready for blacks to move to suburbs and non-impacted areas with § 8 assistance. Dec. 12, 1986 Hearing: Testimony of Lori Palmer.

**70.** The City of Dallas opposition to the Consent Decree was cited by Congressman Martin Frost in support of "the Frost Amendment." Dec. 12, 1988 Hearing: Pls. Exh. 76; Pls. Exh. 77, p. 2.

**71.** Mrs. Nash testified in opposition to the Decree at the Dec. 12, 1986 fairness hearing; and, at the time of her appointment to the DHA Board, Mrs. Nash was an appellant in an abortive appeal to have the consent decree set aside. Dec. 12, 1986 Hearing: Testimony of Mattie Nash. See *Walker v. City of Mesquite,* 858 F.2d 1071 (5th Cir.1988).

**72.** The City rejected DHA's request for the use of CDBG funds to help pay for the housing mobility services and the relocation benefits provided in the Decree. The attempt to justify this by arguing that the City offered DHA a loan at 7.5% is unavailing; such a "loan" was of no value since, at the City's insistence, DHA had already received HUD approval to use funds from the settlement of the lead contamination suit for the mobility and relocation expenses. DHA First Annual Report, pp. 35–37 (Jan. 20, 1988).

**73.** See the discussion above in III(13): "Housing Quality Inspections (1978–1979)."

**74.** Dec. 12, 1988 Hearing: Pls. Exh. 60 (Mayor Strauss letter to HUD); Pls. Exh. 62 (*Country Creek* letters); Pls. Exh. 68 (newspaper stories re opposition); Pls. Exh. 69 (Mayor Strauss letter to HUD); Pls. Exh. 70 (Mayor Strauss remarks at press conference); Pls. Exh. 64 (Deposition of City Council Member Charles Tandy, pp. 13–15).

cause they are unfit for human occupancy;

(iii) some oppose the demolition of *any* public housing at *any* location because of the need to preserve even dilapidated and uninhabitable units of low-income public housing;

(iv) but they also supported the demolition of *Washington Place* in 1975, and then did nothing to assist DHA in replacing these units with public housing in non-minority areas.

Some of the opposition to the Decree was also based upon a desire for more time in which to find alternatives to the West Dallas demolition. But *over two and one-half years have passed since the approval of the Consent Decree—and not a single, viable "alternative" has been presented to this Court.* There have been no offers from Washington for the $88 million (or more) that it will take to rehabilitate West Dallas and its surrounding neighborhood.[75] And, of course, the City of Dallas has not been willing to commit any money for this purpose—or to follow the recommendation of the "Mayor's Housing Mediation Team" that the City should "voluntarily agree to enter into the *Walker v. HUD* Consent Decree."

## V. *The Applicable Law*

Under the law, there are two separate justifications for compelling the joinder of the City of Dallas in this case: the "All Writs Act," 28 U.S.C. § 1651; and Rule 21, Fed.R.Civ.P.

### 1. *The All Writs Act*

28 U.S.C. § 1651(a) provides:

"The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and

agreeable to the usages and principles of law."

Under the "All Writs Act," it has been repeatedly held that federal district courts may issue such orders "as may be necessary or appropriate to effectuate and prevent the frustration of orders it has previously issued." *United States v. New York Telephone Co.*, 434 U.S. 159, 172, 98 S.Ct. 364, 372, 54 L.Ed.2d 376 (1977). And, as stated in *New York Telephone:*

"The power conferred by the Act extends, under appropriate circumstances, to persons who, though not parties to the original action or engaged in wrongdoing, are in a position to frustrate the implementation of a court order or the proper administration of justice, *Mississippi Valley Barge Line Co. v. United States,* 273 F.Supp. 1, 6 (ED Mo.1967), summarily aff'd, 389 U.S. 579 [88 S.Ct. 692, 19 L.Ed.2d 779] (1968); *Board of Education v. York,* 429 F.2d 66 (CA 10 1970), cert. denied, 401 U.S. 954 [91 S.Ct. 968, 28 L.Ed.2d 237] (1971), and encompasses even those who have not taken any affirmative action to hinder justice. *United States v. McHie,* 196 F. 586 (ND Ill.1912); *Field v. United States [United States v. Field],* 193 F.2d 92, 95–96 (CA2), cert. denied, 342 U.S. 894 [72 S.Ct. 202, 96 L.Ed. 670] (1951)" (434 U.S. at 174, 98 S.Ct. at 373).[76]

### 2. *Rule 21*

Rule 21, Fed.R.Civ.P., provides that "parties may be dropped or added by order of the court on motion of any party ... and on such terms as are just."

Under this rule, a party may be added at any stage on the case. For example, parties have been added after trial and even while an appeal was pending.[77] Indeed, in one case, Rule 21 was used to add parties after the appeal had reached the United

---

**75.** The cost of renovating *only* the 3500 units at West Dallas was estimated at $47.8 million in 1980 (Dec. 12, 1988 Hearing: Pls. Exh. 46, pp. 20, 39, 59), and at $65 million at the Dec. 12, 1986 fairness hearing (testimony of Jack Herrington). The cost of rehabilitating *both* the West Dallas units and the surrounding neighborhood was estimated at $88 million in 1983 (Dec. 12, 1988 Hearing: Pls. Exh. 49, pp. 78–86).

**76.** See also *Washington v. Fishing Vessel Assn.,* 443 U.S. 658, 692 at n. 32, 99 S.Ct. 3055, 3078 at

n. 32, 61 L.Ed.2d 823 (1979) ("nonparties who interfere with the implementation of court orders establishing public rights may be enjoined"); *Clients' Council v. Pierce,* 711 F.2d 1406, 1426 (8th Cir.1983); *Valley v. Rapides Parish School Board,* 646 F.2d 925, 943 (5th Cir.1981); *United States v. State of Texas,* 495 F.2d 1250, 1251 (5th Cir.1974).

**77.** *Reichenberg v. Nelson,* 310 F.Supp. 248 (D.C. Neb.1970) (after trial); *Reed v. Robilio,* 376 F.2d 392 (6th Cir.1967) (on appeal).

States Supreme Court.[78]

### 3. Joinder of the City

In this case, it is necessary to join the City of Dallas, as a defendant subject to the Consent Decree, in order to prevent the frustration of the Decree—and in order to prevent the City from obstructing the implementation of the Decree.[79]

The City of Dallas is not an innocent bystander. Instead, as discussed above, the City has been a substantial cause of the racial segregation in public housing in Dallas—the very problems sought to be corrected by the Consent Decree—both through its own actions and through its failure to stop DHA's blatant practices of discrimination and segregation in all of its public housing programs.

In addition, the Consent Decree was explicitly conditioned on the premise "that the resources currently available to DHA to implement the Decree are inadequate" and that "substantial resources will have to be made available from institutions and organizations other than DHA." (Decree, Summary p. 2). There is no question that resources are not available to accomplish the remedial purposes of the Consent Decree; for example:

(i) there has not been a sufficient supply of § 8 housing to meet the quality standards and locational requirements of the Decree;

(ii) there has not been adequate resources to fund the demolition of *all*

vacant units at West Dallas, particularly in view of the "Anti–Demolition Statute," 42 U.S.C. § 1437p; [80]

(iii) there has not been sufficient "fair housing" or code enforcement efforts by the City to accomplish the purposes of the Decree to assure housing opportunities for minority in non-impacted areas and to improve the quality of the public housing in all of DHA's programs; and

(iv) there has not been sufficient resources to improve the facilities and neighborhoods of the predominately minority DHA projects, so that they are substantially equivalent to the HUD assisted units currently housing white low-income families.[81]

In addition to these and other resources needed to effectuate the Consent Decree,[82] DHA has engaged in repeated and pervasive violations of the Decree. See the *Walker I* opinion. However, instead of assisting DHA in obtaining the necessary resources—or intervening to stop DHA's violations of the Decree—the City (through its elected officials and its employees) has chosen to oppose the Consent Decree and to frustrate its implementation.

Accordingly, the joinder of the City of Dallas is not only appropriate—it is essential to the Consent Decree—under the "All Writs Act," 28 U.S.C. § 1651(a), and under Rule 21, Fed.R.Civ.P.[83]

---

**78.** *Mullaney v. Anderson,* 342 U.S. 415, 72 S.Ct. 428, 96 L.Ed. 458 (1952).

**79.** The appropriateness of adding, as parties, additional political subdivisions who have participated in the creation of racially segregated systems in order to accomplish a full remedy for that segregation is well established. *Bradley v. Milliken,* 484 F.2d 215, 221–224 (6th Cir.1973), reversed on other grounds, 418 U.S. 717, 744–745, 94 S.Ct. 3112, 3127, 41 L.Ed.2d 1069 (1974); *Reed v. Rhodes,* 662 F.2d 1219, 1221 (6th Cir. 1981); *Hart v. Community School Board,* 383 F.Supp. 699, 752–755 (E.D.N.Y.1974); *Bradley v. School Board of City of Richmond,* 51 F.R.D. 139 (E.D.Va.1970).

**80.** This is discussed in the *Walker II* opinion.

**81.** *The need for these additional resources (and others)—and the obligation of the City of Dallas to cooperate in providing them—was recognized*

in the "Mayor's Housing Mediation Team Report (April 13, 1988)."

**82.** The City has argued that its joinder is not necessary because other parties, primarily HUD, can provide the "additional resources" that are needed. This is wrong. The Consent Decree provides that "under no circumstances . . . shall any modification increase, alter, otherwise affect the financial or other obligations of HUD pursuant to this Decree without the written consent of HUD." Consent Decree, Summary p. 3.

**83.** The City also contends that the plaintiffs waived the right to join the City by not suing it before the entry of the Consent Decree—and that "the Court concurred with the decision that complete relief did not require joining the City." Again, this is simply wrong. As discussed above, although the City was not a party to the Decree, it joined in the negotiations and its

## VI. *Conclusion*

For these reasons, the City of Dallas will be joined as a party defendant in this case—and summary judgment as to liability will be entered against the City on the plaintiffs' claims that the City of Dallas was a substantial cause of DHA's deliberate racial segregation and discrimination in its public housing programs in Dallas.

The Consent Decree will be modified so that it is binding on the City of Dallas. However, the specific modifications to be made and the scope of injunctive relief—together with the financial obligations to be imposed on the City—will be determined only after a hearing and the presentation of evidence by all parties.

support for the Decree was promised and expected; otherwise, there would have been no settlement. Therefore, there was no "waiver" by the plaintiffs' decision not to sue the City at that time—and this Court, when approving a Consent Decree which recited that "substantial *additional resources*" were necessary, certainly expected the City to support, not oppose, the Consent Decree.